



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT JACKSON

| | | |
|---|---|---|
| RUTH ANN SLAYTON, | ) | Docket No. 2018-07-0217 |
| Employee, | ) | |
| v. | ) | |
| COMMUNITY HEALTH SYSTEMS, | ) | State File No. 11051-2016 |
| Employer, | ) | |
| And | ) | |
| AGRI GENERAL INS. CO., | ) | Judge Allen Phillips |
| Carrier. | ) | |

---

## COMPENSATION HEARING ORDER FOR PERMANENT DISABILITY BENEFITS

---

The Court conducted a Compensation Hearing on September 27, 2018. The only issue was the extent of permanent partial disability sustained by Ms. Slayton as a result of a February 4, 2016 injury. For the reasons below, the Court holds Ms. Slayton established by a preponderance of the evidence that she sustained a permanent partial disability of fifteen percent to the body as whole.

### History of Claim

Ms. Slayton worked for Community Health as a nurse. On February 4, she felt a "pull" in her neck while lifting a patient and later developed pain and weakness in her right arm. After failed conservative care, Community Health provided authorized care by Dr. Laverne Lovell, who assessed an impairment rating following surgery. Ms. Slayton obtained another rating from Dr. Samuel Chung after an independent medical evaluation (IME). The issue is the difference of opinion regarding the ratings.

### Dr. Lovell's testimony

Dr. Lovell, a neurosurgeon, testified by deposition. He first saw Ms. Slayton on May 11, 2016, and found clinical symptoms of "right upper extremity radiculopathy,

1

which means radiating pain down the arm due to nerve impingement in the neck." Dr. Lovell said Ms. Slayton had the "classic presentation" of both C6 and C7 radiculopathy and noted an MRI and EMG supported the diagnosis.

To alleviate Ms. Slayton's symptoms, Dr. Lovell recommended pain blocks. These met with limited success. So, on August 31, he discussed surgical options of a cervical fusion versus implantation of artificial discs. He told Ms. Slayton to wait three months to "see if her symptoms got better" and to consider surgery if they did not.

In December 2016, Ms. Slayton returned with complaints of pain in her neck and both shoulders and arms. She and Dr. Lovell agreed she had "reached the point" of needing surgery. Thus, he performed a cervical decompression and inserted two artificial discs on April 3, 2017. Afterwards, Ms. Slayton reported initial relief of her right arm numbness and tingling but still had passing "twinges" in her shoulders.

On June 22, Ms. Slayton reported some tingling in her hands. Dr. Lovell thought the tingling might relate to her neck but also believed it could stem from an unrelated ulnar or median nerve issue in her arm. He testified he "kind of blow[s] . . . off" tingling complaints that do not "seem to be a real big problem to the patient." When asked if tingling complaints are "uncommon," Dr. Lovell said some patients have tingling before an operation and occasionally report a trace of it afterwards. In these cases, he attributes the tingling "to their pre-operative problem . . . but I wouldn't say it's something that everybody gets after this operation."

Dr. Lovell found a "normal" physical exam with full strength and "very good motion." He thought Ms. Slayton was "doing well," so he placed her at maximum medical improvement and said she could perform the full duties of her new job as a nurse practitioner.

Dr. Lovell assessed a six-percent permanent impairment to the body as whole, his "customary" rating for the surgery. He based it on the "cervical spine section" of the Sixth Edition of the American Medical Association's Guides to the Evaluation of Permanent Impairment ("Guides"), citing a table that provides a six-percent rating for disc lesions at single or multiple levels with or without surgery and with resolution of radiculopathy, or only "nonverifiable radicular complaints." He "picked" the middle number of a Class I impairment under that table. He said he typically did not use the grade modifiers in the Guides but believed they would "probably" lower the rating based on his experience. In his practice he had "just decided . . . to excuse [himself] from the misery of having to go through [the modifiers] and . . . just pick the center number."

Dr. Lovell specifically disagreed with Ms. Slayton's IME physician that she met the criteria of Class 3 impairment because that class requires residual radiculopathy. To

2

Dr. Lovell, nonverifiable radicular complaints do not qualify as radiculopathy because they are "subjective" complaints. A ratable radiculopathy must be something more than "I get a tingle in my finger periodically." Instead, Dr. Lovell believed verifiable radicular complaints are those documented by either an electrical study or clinical findings of weakness. Given his position, he agreed with Ms. Slayton's counsel that the rating issue "basically comes down to whether or not she had verifiable radiculopathy," and in his opinion Ms. Slayton did not as of June 22.

*Dr. Chung's testimony*

Dr. Samuel Chung also testified by deposition. He is Board-certified in physical medicine and rehabilitation and is a certified independent medical examiner. He has performed hundreds of IMEs since 1997.

Dr. Chung saw Ms. Slayton once, on December 7. He recounted her history and performed a physical examination. In her history, he noted she complained of continued numbness in her right thumb and index finger and similar symptoms on the left. These symptoms were present after the surgery, and she continued to experience them with rotation and extension of her neck to the right. On examination, Dr. Chung found a positive right-sided Spurling's test, a maneuver performed by turning the neck to one side and applying downward pressure. Dr. Chung testified the test elicited residual radiculopathy in the C6 dermatome. Likewise, he found loss of sensation in the C6 dermatome and reflex changes on the right consistent with radiculopathy.

Dr. Chung used the same table as Dr. Lovell, but he placed Ms. Slayton in Class 3 because of his finding of residual radiculopathy. He then looked to the "grade modifiers" of the Guides and noted Ms. Slayton's "functional history" included her experiencing pain when moving her neck to the right; her "physical examination" included the positive Spurling's sign and decreased sensation and reflexes. He did not use the "clinical study" modifier because the pre-surgery MRI and EMG were not to be considered under the instructions of the Guides. When applying these modifiers to the Class 3 "default" rating or "middle number" of the class, Dr. Chung arrived at a fifteen-percent rating.

Dr. Chung acknowledged that an accurate history is necessary for an accurate impairment rating. Further, he testified that Ms. Slayton's ability to perform physical activities "doesn't mean that she doesn't have symptoms of radiculopathy or she's clinically completely clear from any symptoms she is experiencing.

*Ms. Slayton's testimony*

Ms. Slayton testified she suffered pain in her right shoulder blade and the first two fingers of her right hand and experienced a loss of strength in her right arm after the injury. She admitted her symptoms improved after surgery but some remained as of June

3

22 when Dr. Lovell released her. The numbness and tingling was "not as significant" or as severe but was still present in her first two fingers. She said Dr. Lovell checked her grip strength by having her squeeze his fingers on June 22 but he performed no other testing. After they discussed her activities, he released her to full duty. Ms. Slayton said Dr. Chung's IME lasted three hours, and he performed tests that replicated her radicular symptoms.

Ms. Slayton testified she returned to Dr. Lovell in October 2017 with what she described as significant neck and shoulder blade pain and continued numbness in her fingers. Dr. Lovell recommended she slow her activities given her age. She testified she had already done so to avoid reinjuring herself and pointed specifically to avoidance of heavy weightlifting at a boot camp program and quitting martial arts "sparring" in favor of non-contact movements. Community Health directly confronted Ms. Slayton with a video and several photographs depicting her engaging in non-violent martial arts maneuvers on several occasions in May, June, and August 2018.

Ms. Slayton continued her education during her recuperation and became a nurse practitioner. She voluntarily left Community Health to enter private practice.

*Parties' Positions*

Ms. Slayton argued that Tennessee Code Annotated section 50-6-204(k)(2)(A) (2018) requires the treating physician to use the applicable edition of the Guides when assessing a rating. As the treating physician, Dr. Lovell's rating is presumed correct. However, Ms. Slayton contended she rebutted it by a preponderance of the evidence. She introduced pages from Guides titled "Principles of Assessment" of the spine, which explain the proper rating procedure. These pages dictate a physician is to determine the impairment class by determining the diagnosis and making findings of specific criteria. Then, the physician is to adjust that number by grade modifiers. Here, Dr. Chung followed that protocol; Dr. Lovell did not. Ms. Slayton confirmed the procedure followed by Dr. Chung and contended he offered the better explanation.

Community Health countered that "verifiable radicular complaints" mean objective findings, and Ms. Slayton's complaints were wholly subjective. As the treating physician, Dr. Lovell was in a "better place" to assess impairment, as "the Legislature says." Dr. Lovell used the Guides but "just did not do multipliers."

**Findings of Fact and Conclusions of Law**

Ms. Slayton must prove all elements of her case by a preponderance of the evidence, including the amount of her permanent partial disability. Tenn. Code Ann. §

4

50-6-239(c)(6). For the following reasons, the Court holds she proved a permanent partial disability of fifteen percent.

In reaching this holding, the Court must determine which expert opinion to accept. *Sanker v. Nacarato Trucks, Inc.*, 2016 TN Wrk. Comp. App. Bd. LEXIS 27, at *11-12 (July 6, 2016). To make that determination, the Court may consider the qualifications of the experts, the circumstances of their evaluation, the information available to them, and the evaluation of the importance of that information by other experts. The Court also might accept the opinion of one expert over another if it contains the more probable explanation. *Ledford v. Mid-Georgia Courier*, 2018 TN Wrk. Comp. App. Bd. LEXIS 28, at *7 (June 4, 2018). If one expert is an authorized physician, then his impairment rating is afforded a presumption of correctness subject to rebuttal by a preponderance of the evidence. Tenn. Code Ann. § 50-6-204(k)(7).

Regarding the expert's qualifications, the Court notes Dr. Lovell is a neurosurgeon with many years of experience. As to Dr. Chung, the Court considers his extensive practice in rehabilitation and physical medicine and his certification as an independent medical examiner. Given these considerations, the Court finds the physicians on equal footing as to their qualifications to provide an accurate rating.

Next, the Court considers the circumstances of the two evaluations. The Court finds this factor militates in favor of Dr. Lovell. He was the treating physician and had more extensive contact with Ms. Slayton. Tennessee law considers it reasonable to conclude that the physician having greater contact with an injured worker has an advantage in providing a more in-depth, if not more accurate opinion. *Bass v. Home Depot U.S.A., Inc.*, 2017 TN Wrk. Comp. App. Bd. LEXIS 36 at *14 (May 26, 2017). But, the issue here turns not on the circumstances of the physician's evaluations but rather on the information available to them and the importance of that information in the context of their ratings. When considering those factors, the Court holds Dr. Chung offered the more probable explanation of Ms. Slayton's impairment.

First, the Court holds the evidence preponderates in favor of Ms. Slayton's position that she suffers residual radiculopathy, the first requirement of a fifteen-percent rating. Dr. Chung diagnosed residual radiculopathy based on clinical findings of a positive Spurling's test and diminished reflexes and sensation. The Court contrasts these clinical findings with Dr. Lovell's unsupported statement that he found no true radicular complaints. Likewise, Ms. Slayton detailed the more extensive evaluation by Dr. Chung.

Further, the Court believes Ms. Slayton's testimony that she suffers residual radicular problems in her right upper extremity. Based on its direct observation of her, the Court finds Ms. Slayton was steady, forthcoming, and honest regarding her condition and finds her credible. *Kelly v. Kelly*, 445 S.W.3d 685, 694-695 (Tenn. 2014). The Court

5

considers this testimony important because it should not read the medical proof "in a vacuum." *Thomas v. Aetna Life & Cas.*, 812 S.W.2d 278, 283 (Tenn. 1991). Further, rather than yielding to injury, Ms. Slayton maintained an active lifestyle as evidenced by her testimony and the video and photographs of her performing martial arts maneuvers. However, these occurred well after her medical evaluations by both physicians and revealed nothing more than non-contact activities.

Second, Dr. Chung explained his rating methodology in detail. He pointed to the Guides' definition of Class 3 impairment and explained his use of the functional history, physical examination, and clinical study grade modifiers. Dr. Chung followed the methodology dictated by the Guides. His detailed explanation of the process stands in contrast to Dr. Lovell's avoidance of the "misery" of using the modifiers. The Court holds Dr. Chung offered the more probable explanation of Ms. Slayton's true impairment and holds that his opinion rebutted Dr. Lovell's rating by a preponderance of the evidence.

Having determined the correct impairment rating, the Court holds Ms. Slayton is entitled to permanent partial disability benefits of 67.5 weeks, or $45,281.70. This is calculated by multiplying the fifteen-percent rating by 450 weeks and multiplying that result by the stipulated weekly compensation rate of $670.84. Tenn. Code Ann. § 50-6-207(3)(A). Ms. Slayton is not entitled to any enhancement factors because she voluntarily left her employment at Community Health. Tenn. Code Ann. § 50-6-207(3)(d)(i).

**IT IS, THEREFORE, ORDERED** as follows:

1. Community Health shall pay Ms. Slayton permanent partial disability benefits of $45,281.70. Mr. Barnes is entitled to a twenty-percent attorney's fee of the total award under Tennessee Code Annotated section 50-6-226(a)(1) equaling $9,056.34. Mr. Barnes may submit a motion for discretionary costs.

2. Community Health shall provide Ms. Slayton future medical benefits for her injury under Tennessee Code Annotated section 50-6-204(a)(1)(A). Dr. Lovell remains the treating physician.

3. Community Health shall pay costs of $150.00 to the Court Clerk under Tennessee Compilation Rules and Regulations 0800-02-21-.07.

4. Community Health shall prepare and submit a Statistical Data Form (SD2) within ten business days of this order becoming final.

5. Absent an appeal, this order shall become final thirty days after issuance.

**ENTERED** this the 23rd day of October, 2018.

_____
**Allen Phillips, Judge**
**Court of Workers' Compensation Claims**

## APPENDIX

Exhibits:
1. Collective Medical Records
2. Deposition of Dr. Laverne Lovell
3. Deposition of Dr. Samuel Chung
4. Pages from AMA Guides Sixth Edition regarding impairment assessment
5. Video of Ms. Slayton performing martial arts
6-9. Photographs of Ms. Slayton performing martial arts

Technical record:
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Scheduling Hearing
4. Scheduling Order
5. Employee's Witness and Exhibit List
6. Joint Pre-Compensation Hearing Statement
7. Employer's Witness and Exhibit List
8. Employee's Pre-Compensation Hearing Brief
9. Post-discovery Dispute Certification Notice
10. Employer's Pre-Compensation Hearing Brief

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Compensation Hearing Order was sent to the following recipients by the following methods of service on this the 23rd day of October, 2018.

| Name | Certified Mail | First Class Mail | Via Email | Service Sent To: |
|---|---|---|---|---|
| Spencer R. Barnes, Esq., Attorney for Employee | | | X | spence@morrisonandbarnes.com |
| Sara Barnett, Esq., Attorney for Employer | | | X | sarabarnett@spraginslaw.com |

Penny Shrum, Clerk of Court
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**